[This opinion has been published in *Ohio Official Reports* at 79 Ohio St.3d 347.]

THE STATE EX REL. MOORE, APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Moore v. Indus. Comm.*, 1997-Ohio-145.]

*Workers' compensation—Violation of a specific safety requirement—Ohio Adm.Code 4121:1-5-22(A)—Industrial Commission does not abuse its discretion in finding that a hopper bin does not constitute a "confined space," when.*

(No. 95-501—Submitted May 20, 1997—Decided August 6, 1997.)

APPEAL from the Court of Appeals for Franklin County, No. 94APD01-19.

—————————

{¶ 1} Appellee Midwest Elastomers, Inc. engages in rubber reprocessing. Through a cryogenic process, rubber is frozen and then pulverized. One of the procedures involved was referred to as the "X-process." Raw rubber material was first dumped into one of six hoppers. The hopper bin in question was six feet wide, eight feet deep, and, at its lowest point, six feet above the floor. The bin was six feet across on the top and completely open. The sides of the bin initially descended straight down and then sloped into a V. A ladder extended fourteen feet from the floor to the top of the bin.

{¶ 2} At the hopper's bottom was an auger with a protective covering. The auger pulled the rubber pieces into a bucket elevator, which transported the material to a freezing chamber. There, liquid nitrogen was sprayed on the rubber, which caused it to become brittle. The brittle rubber then dropped into a hammer mill, which crushed the material. The rubber then moved through a six-inch pipe to a sifter-like machine called a "Sweco," which separated recoverable material from rejects.

**{¶ 3}** Integral to the entire process was the liquid nitrogen. In the course of the freezing process, the nitrogen expanded into a gas. The gas ultimately traveled through the enclosed system to the Sweco, where it was either recycled into the freezing chamber or vented harmlessly into the plant.

**{¶ 4}** Each day before the X-process was begun, vent lines were cleaned. The parties agree that on the morning of October 16, 1990, the vents had been cleaned. Later that day, for reasons unknown, a Midwest employee, Gregory C. Moore, climbed into the hopper. Unbeknownst to Moore, or any other Midwest employee, the two Sweco vents had become blocked with rubber material. This caused the nitrogen gas to back up into the hopper, overcoming Moore. A fellow employee, Marshall O. Russell, Jr., noticed Moore's forklift by the hopper, but could not find Moore. Investigating, Russell found Moore in the hopper and attempted to rescue him, but was also overcome. Other employees, alerted to the situation, quickly removed the two men. Russell was successfully revived. Moore was not.

**{¶ 5}** Widow-claimant Lisa L. Moore, appellant herein, filed a workers' compensation death claim with appellee Industrial Commission of Ohio. Following allowance of that claim, she filed an application for additional compensation, alleging violations of several specific safety requirements ("VSSR"). She later withdrew the claimed violations of Ohio Adm.Code 4121:1-5-22(D) and 4121:1-5-02(D)(1).

**{¶ 6}** After investigation and transcribed hearing, the commission denied claimant's application, writing in part:

"It is the finding of the Hearing Officer that the Application for Violation of a Specific Safety Requirement be denied for the reason that the widow-claimant has cited no specific safety requirement which was violated resulting in decedent's death.

"The findings and order are based on the V.S.S.R. Investigation Report, affidavits, photographs, evidence in file and evidence adduced at hearing.

"In this case the decedent, a material handler, died on October 16, 1990 because of asphyxiation. The asphyxiation occurred while decedent was inside a feedstock hopper.

"* * * [T]he only rules under consideration are [Ohio Adm.Code] 4121:1-5-22(A)(1) [and] (2) [and] (C); 4121:1-5-17(F)(1); and 4121:1-5-18(C)(2)[,] (3) [and] (4).

"Before reviewing the merits of the cited rules[,] a brief explanation is stated herein outlining how the feed hopper and related processes work.

"The employer is involved in a rubber re-processing operation. There are various feed hoppers used throughout the plant. Raw rubber materials are put into these hoppers. An auger moves the raw material to a bucket elevator and the bucket elevator takes the product over to a freezing chamber. The products are then separated into groups that meet the required specifications and those that do not meet the specifications are rejected.

"Involved in this process is nitrogen that is piped from the outside through underground pipes to the factory. The nitrogen is brought into valves that inject the nitrogen with the rubber product to keep it cold. The liquid nitrogen then becomes gaseous and vents into the plant. It was estimated that the liquid nitrogen is injected approximately 15 to 20 feet from where the hopper is located.

"Apparently in this case the pipelines carrying the nitrogen became plugged and the nitrogen gas was not vented normally and backed up into the hopper overcoming the decedent. It should be emphasized that the mixing of the nitrogen with the rubber is entirely a closed process.

"Rule 4121:1-5-22 states that: '(A) No employee shall be required to enter into any confined space unless the confined space entry procedure, incorporating one of the following, is used (see appendix to this rule for recommended entry

procedures): (1) Air sampling shall be performed by qualified, trained personnel prior to and periodically during occupancy to determine that the atmosphere within the confined space contains an adequate quantity of oxygen ([nineteen] per cent), and any known or expected harmful atmospheric contaminants have been diluted to safe concentrations.  (2) [A supplied-air] respirator or a self-contained breathing apparatus is provided and used.  [* * *] (C)  Appropriate control measures, which may consist of forced or natural ventilation, use of personal protective equipment, a combination of these[,] or other effective control techniques, shall be instituted if tests under [p]aragraph (A)(1) or (B) of this rule indicate that the atmosphere in the space to be entered contains: (1) [A]ny concentration of flammable vapor or gas [ten per cent] or greater of the lower explosive limit; and/or (2) [A] hazardous concentration of any known or expected toxic contaminants; and/or (3) [L]ess than nineteen per cent oxygen.'

"Before reviewing the merits of this rule it is necessary to determine if the hopper in question would qualify as a confined space under the rules.  4121:1-5-01(B)(28) defines confined space as: 'an enclosure not intended for continuous employee occupancy, having limited means of ingress and egress and poor natural ventilation and which may contain hazardous contaminants or be oxygen deficient.'  The hopper in question is concluded not to fall within this definition of a confined space.  Specifically, there is no record prior to this incident of the hopper ever containing nitrogen gas, which is a hazardous contaminant.  George Everage, a company foreman for the employer, stated that for a period of at least eight years prior to this incident [no one] in the plant [was] aware that nitrogen gas could get into the feed hopper.

"Therefore, because the rule implicitly requires that the employer be aware that this area may contain a hazardous contaminant, and here the employer had no way of knowing that the hopper could contain the hazardous contaminant nitrogen gas[,] the hopper does not meet the definition of a confined space.

4

"Also, the hopper would not have poor ventilation as the rule required because the hopper was open at the top approximately six feet and therefore there was natural ventilation.

"Therefore, because the hopper does not meet the definitional requirements of a confined space as explained previously, none of the subsections under Rule 4121:1-5-22 apply and no violation of that rule is found. * * *"

{¶ 7} The commission also found no violation of the rest of the cited specific safety requirements.

{¶ 8} Claimant sought reconsideration as to the finding of no violation of Ohio Adm.Code 4121:1-5-22(A) only. Reconsideration was denied as follows:

"Second, widow/claimant contends [that] the finding of the Deputy that the feedstock hopper in which decedent died was not a 'confined space' for purposes of OAC 4121:1-5-01(B)(28) is an obvious mistake of fact. The basis for the finding contained in the order, that the hopper was open at the top, is not contested by widow/claimant. Rather, widow/claimant contends that the fact of decedent's death demonstrates the inadequacy of the ventilation created by the opening of the hopper at the top, at least insofar as it applies to the presence of nitrogen. The term used in the applicable rule is 'poor natural ventilation.' Without a quantified standard, the application of the fact of an open-top hopper to the term 'poor natural ventilation' is a mixed question of law and fact. OAC 4121-3-20(G) does not provide for rehearing unless the argued mistake is both one of fact (and not of law) and obvious.

"Third, widow/claimant contends [that] the conclusion contained in the Deputy's order that, to qualify as a 'confined space' the employer must be aware [that] the area may contain a hazardous contaminant is an obvious mistake of fact. This is solely a question of applicable law and as such no rehearing is provided for under OAC 4121-3-20(G)."

**{¶ 9}** Claimant filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in finding no violation of Ohio Adm.Code 4121:1-5-22(A). The court held that the commission did not abuse its discretion in finding that the hopper bin did not constitute a "confined space." It accordingly upheld the determination of this rule's inapplicability and denied the writ.

**{¶ 10}** This cause is now before this court upon an appeal as of right.

_____

*Siferd & Reed, L.P.A., Richard E. Siferd* and *Victoria U. Maisch,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Dennis L. Hufstader,* Assistant Attorney General, for appellee Industrial Commission of Ohio.

*Vorys, Sater, Seymour & Pease* and *Robert E. Tait,* for appellee Midwest Elastomers, Inc.

_____

***Per Curiam.***

**{¶ 11}** Ohio Adm.Code 4121:1-5-22(A) reads:

"Confined spaces

"(A) No employee shall be required to enter into any confined space unless a confined space entry procedure, incorporating one of the following, is used (see appendix to this rule for recommended entry procedures):

"(1) Air sampling shall be performed by qualified, trained personnel prior to and periodically during occupancy to determine that the atmosphere within the confined space contains an adequate quantity of oxygen (nineteen per cent), and any known or expected harmful atmospheric contaminants have been diluted to safe concentrations.

"(2) A supplied-air respirator or self-contained breathing apparatus is provided and used."

{¶ 12} Neither of these procedures was followed. At issue is whether they needed to be. The commission and court of appeals answered this question in the negative. Both found that the hopper bin was not a "confined space," rendering Ohio Adm.Code 4121:1-5-22(A) inapplicable. We agree.

{¶ 13} The interpretation of a specific safety requirement rests with the commission. *State ex rel. Jeep Corp. v. Indus. Comm*. (1989), 42 Ohio St.3d 83, 537 N.E.2d 215. Because it is a penalty against the employer, "it must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer." *State ex rel. Burton v. Indus. Comm*. (1989), 46 Ohio St.3d 170, 172, 545 N.E.2d 1216, 1219. Ohio Adm.Code 4121:1-5-01(B)(28) defines a "confined space" as "an enclosure not intended for continuous employee occupancy, having limited means of ingress and egress and poor natural ventilation and which may contain hazardous contaminants or be oxygen deficient."

{¶ 14} In this case, there is "some evidence"—indeed all the evidence establishes—that the hopper was completely open on the top. This large opening, in the commission's view, provided sufficient natural ventilation to remove the machine from the ambit of Ohio Adm.Code 4121:1-5-01(B)(28). This finding was within the commission's discretion and is, alone, sufficient to render Ohio Adm.Code 4121:1-5-22(A) inapplicable.

{¶ 15} The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

—————————